UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
MARJORIE MCFARLANE, VELMA
PALMER, and CLAIRE WILLIAMS,

                Plaintiffs,

     - against -

HARRY'S NURSES REGISTRY, HARRY'S
HOMECARE, INC., and HARRY
DORVILIER,

                Defendants.
---------------------------------------------------------x

**MEMORANDUM & ORDER**
17-CV-06350 (PKC) (PK)

PAMELA K. CHEN, United States District Judge:

       Plaintiffs Marjorie McFarlane, Velma Palmer, and Claire Williams bring this action against

Defendants Harry's Nurses Registry and Harry's HomeCare, Inc. (collectively, the "Corporate

Defendants"), and *pro se* Defendant Harry Dorvilier, alleging violations of the Fair Labor

Standards Act ("FLSA") and New York Labor Law ("NYLL"). Plaintiffs move for default

judgment as to the Corporate Defendants and, separately, for summary judgment as to Defendant

Harry Dorvilier. For the reasons set forth below, Plaintiffs' motions are granted in part and denied

in part.

## BACKGROUND

### I.    Defendants

       Defendant Harry's Nurses Registry ("Harry's Nurses") is a corporation with its principal

place of business located at 88-25 163rd Street, Jamaica, New York. (Plaintiffs' Rule 56.1

Statement[1] of Undisputed Material Facts ("Pls.' 56.1"), Dkt. 58-3, ¶ 1.) Harry's Nurses also does business as Harry's HomeCare, Inc. ("Harry's HomeCare"). (*Id.* ¶ 3.) Defendant Dorvilier is the sole owner of Harry's Nurses and has worked there since its incorporation in 1991. (Deposition of Harry Dorvilier ("Dorvilier Dep."), Dkt. 58-5, at 5:21–6:20.)

Harry's Nurses refers temporary healthcare personnel, including Licensed Practical Nurses (LPNs), to work in patients' private homes in and around New York City. (Pls.' 56.1, Dkt. 58-3, ¶ 4.) Harry's Nurses screens and selects nurses before placing them on a "registry" of field nurses. (*Id.* ¶¶ 6, 8.) At any given time, Harry's Nurses may have as many as 500 field nurses on the registry. (*Id.* ¶ 7.) When a client requests a nurse placement, Harry's Nurses generates a pool of field nurses from the registry whose qualifications coincide with the needs and condition of the patient. (*Id.* ¶¶ 20, 22.) Nurses on the registry also provide their schedules to Harry's Nurses in order to be matched to patients. (Dorvilier Dep., Dkt. 58-5, at 11:18–12:13.) Once matched, the nurses schedule their own hours and work with the patients to do so. (*Id.* at 20:11–21:4, 21:14–

---

[1] With respect to Plaintiffs' summary judgment motion against Defendant Dorvilier, unless otherwise noted, a standalone citation to Plaintiff's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citation to Plaintiff's 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document. The Court has deemed facts averred in Plaintiffs' 56.1 statement to which Defendant Dorvilier cites no admissible evidence in rebuttal as undisputed. *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)). Additionally, to the extent Plaintiffs' 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement. *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012). Although Defendant Dorvilier did not file a Rule 56.1 Counterstatement, as required by the local rules, in light of his *pro se* status, the Court overlooks this failure and examines his Affidavit (Dkt. 57), as well as the underlying factual exhibits submitted by the parties. *See Onitiri v. Security*, No. 12-CV-5425 (PKC), 2015 WL 13019584, at *1 (E.D.N.Y. Feb. 5, 2015) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)).

20.) Field nurses on the registry are required to carry their own professional liability insurance, and each individual nurse is also responsible for maintaining their professional license. (Pls.' 56.1, Dkt. 58-3, ¶ 44; Pls.' Decls., Dkt. 58-20, at ECF[2] 3 ¶¶ 8–9, ECF 18 ¶¶ 8–9, ECF 36 ¶¶ 9–10.) Separate from the nurses on the registry, Harry's Nurses employs between seven to ten full-time employees in positions such as the director of patient services, office manager, accountant, field nurse staffer, homecare and field nurse staffer, staff coordinator, nursing supervisor, and payroll clerk. (Pls.' 56.1, Dkt. 58-3, ¶ 5.) Field nurses are regularly evaluated by the nursing supervisor. (*Id.* ¶ 36.)

Harry's Nurses does not "determine [its own] pay rates" for field nurses. (Dorvilier Dep., Dkt. 58-5, at 17:23–25.) Rather, Harry's Nurses sets an hourly rate of pay for field nurses based on the prevailing Medicaid reimbursement amount for a nurse's patient. (*Id.* at 18:3–15, 20:3–5.) In 2008, approximately 95% of field placements for Harry's Nurses were for the care and treatment of Medicaid patients. (Pls.' 56.1, Dkt. 58-3, ¶ 42.)

## II.    Plaintiffs' Work with Defendants

Plaintiffs are LPNs who were hired by Defendant Harry's Nurses—McFarlane and Williams in 2008 (Pls.' Decls., Dkt. 58-20, at ECF 2 ¶ 3 (McFarlane), ECF 35 ¶ 4 (Williams)), and Palmer in 2011 (*id.* at ECF 17 ¶ 3 (Palmer)).[3] Plaintiffs each signed a Memorandum of Agreement[4] with Harry's Nurses, which states that "Harry's Nurses Registry, Inc. will pay a per

---

[2] "ECF" refers to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[3] The Court notes that, in contrast to the declarations they submitted with their summary judgment motion, Plaintiffs' 56.1 statement states that they were hired in 2003. (Pls.' 56.1, Dkt. 58-3, ¶¶ 56, 68, 80.)

[4] Separately, and to the extent that each Memorandum of Agreement states that a Plaintiff were hired as an independent contractor (Dkt. 58-12), "an employer's self-serving label of workers

diem of pay to be agreed upon prior to the commencement of duty." (Memoranda of Agreement, Dkt. 58-12, at ECF 4 (McFarlane, dated December 22, 2008), ECF 2 (Palmer, dated January 2, 2012), ECF 3 (Williams, dated December 16, 2008).) Plaintiffs left Harry's Nurses in 2015. (Pls.' 56.1, Dkt. 58-3, ¶¶ 56, 68, 80.) According to Defendant Dorvilier, Plaintiffs "were referred to another agency" in 2015 and then "decide[d] to come back" to Harry's Nurses. (Dorvilier Dep., Dkt. 58-5, at 18:19–23.) Plaintiffs were rehired by Harry's Nurses in February 2016, allegedly[5] at a rate of pay of $25.00 per hour. (Pls.' 56.1, Dkt. 58-3, ¶¶ 56, 68, 80.) Plaintiffs continued to work for Harry's Nurses until mid-November 2017. (*See* Pls.' Decls., Dkt. 58-20, at ECF 15 ¶ 73 (McFarlane), 34 ¶ 76 (Palmer), 50 ¶ 67 (Williams); Dorvilier Dep., Dkt. 58-5, at 17:16–22 (noting that all three Plaintiffs left Harry's Nurses at the same time).) Plaintiffs all worked with the same patient or patients in the time period relevant to this action. (*See* Pls.' Decls., 58-20, at ECF 3 ¶ 13, ECF 18 ¶ 13, ECF 36 ¶ 14; Time Sheets, Dkts. 58-15, 58-16, 58-17 (indicating that Plaintiffs provided homecare services to the same "client," P.B.[6]); Dorvilier Dep., Dkt. 58-5, at 16:13–16 (noting that "[a]ll three of them work for the same patients.").)

## A. Plaintiff McFarlane's Wages and Hours

According to Plaintiff McFarlane, from February 16, 2016 until October 27, 2017, she was paid $19.00 per hour when she worked fewer than 40 hours per week and a lower hourly rate that varied from $16.29 to $18.00 when she worked more than 40 hours per week. (Pls.' Decls., Dkt.

---

as independent contractors is not controlling" for purposes of the FLSA. *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 141 (2d Cir. 2017) (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988)).

[5] As discussed *infra*, Defendant Dorvilier disputes hiring Plaintiffs at an hourly rate of $25.00 but does not otherwise state the rate at which they were hired.

[6] The Court uses the client's initials to protect their privacy.

58-20, at ECF 5 ¶¶ 26–27.) Her timesheets and wage statements, which cover two-week pay periods, generally confirm[7] that she was typically paid at the hourly rate of $19.00 when she worked fewer than 40 hours in one week. (*See* Dkt. 58-15, at ECF 2–13, 16–22, 24–27, 29–41, 43–66, 72–79, 82–96.) However, in one pay period, she was somewhat inexplicably paid at an hourly rate of $18.00 for 36 hours of work in one week. (*Id.* at ECF 14–15.) In weeks during which she worked more than 40 hours per week, McFarlane usually was paid $17.54/hour for the first 40 hours and then $26.31/hour for the next 8 hours. (*Id.* at ECF 22–23, 28, 42, 70–72, 80–81.) At other times,[8] McFarlane worked 40 hours in one week at an hourly rate of $17.04 and the next 12 hours at an hourly rate of $25.56 (*id.* at ECF 67); or 40 hours in one week at an hourly rate of $16.29, with the next 20 hours at an hourly rate of $24.44 (*id.* at ECF 67, 78–79). The last pay period included in McFarlane's wage statements ended on October 27, 2017. (*Id.* at ECF 94–95.)

## B. Plaintiff Palmer's Wages and Hours

Plaintiff Palmer also asserts that, from February 2016 to October 27, 2017, she was paid $19.00 per hour when she worked under 40 hours per week and a lower, varying hourly rate when she worked more than 40 hours per week. (Pls.' Decls., Dkt. 58-20, at ECF 20 ¶¶ 25–27.) Her timesheets and wage statements also bear out her assertions. From January 23 to February 5, 2016,

---

[7] However, there are some discrepancies between McFarlane's timesheets and wage statements. For example, for the "Pay Period: 08/25/2017 – 09/01/2017," Plaintiff McFarlane's wage statement indicates that she worked 72 hours that week at an hourly rate of $19.00 (Dkt. 58-15, at ECF 86), but her time sheet indicates that she worked only 36 hours that week (*id.* at ECF 87). There are also a number of pay periods in which McFarlane appears to have a "Net Pay" of $0.00. (*See, e.g.*, Dkt. 58-15, at ECF 48.) However, her Declaration does not state that she was not paid in these instances. (*See* Pls.' Decls., Dkt. 58-20, at ECF 10–11 ¶ 51.)

[8] It is unclear whether Plaintiff McFarlane was actually paid for working these hours, as the check for the given pay period shows zero dollars, and a note on the pay sheet says "Unmatch hours." (*Id.* at ECF 67.)

and again in several other pay periods, Palmer worked fewer than 40 hours per week and was paid at the rate of $19.00/hour.  (Dkt. 58-16, at ECF 14–15, 26–29, 46–47, 53–54, 65–66, 84–85.) However, Palmer typically worked for 60 hours per week and was paid $16.29/hour for the first 40 hours and then $24.44 for the next 20 hours.  (*Id.* at ECF 2, 4–13, 16–21, 24–27, 30–45, 48–52, 55–62, 67–85.)  Palmer also occasionally worked 72 hours in a single week, for which she was paid $15.55/hour for the first 40 hours and then $23.33/hour for the next 32 hours.  (*Id.* at ECF 14–15, 40–45, 63–66, 78–80.)  In several weeks, Palmer worked other variable hours and was compensated as follows: a total of 48 hours, at an hourly rate of $17.54 for the first 40 hours and $26.31/hour for the next 8 hours (*id.* at ECF 22–23, 34–35, 51–52, 67–68); a total of 56 hours, at an hourly rate of $16.63 for the first 40 hours and $24.95/hour for the next 16 hours (*id.* at ECF 4–5); a total of 61 hours, at an hourly rate of $16.21 for the first 40 hours and $24.32/hour for the remaining 21 hours (*id.* at ECF 69–71); a total of 64 hours, at an hourly rate of $16.00 for the first 40 hours and $24.00/hour for the remaining 4 hours (*id.* at ECF 60–61); and a total of 68 hours, at an hourly rate of $15.76 for the first 40 hours and $23.64/hour for the remaining 28 hours (*id.* at ECF 2).  The last pay period included in Palmer's wage statements ended on October 27, 2017. (*Id.* at ECF 4–5.)

C.     **Plaintiff Williams's Wages and Hours**

Plaintiff Williams similarly avers that, from February 2016 to October 27, 2017, she was paid at a rate of $19.00/hour when she worked fewer than 40 hours in one week and a lower, varying rate when she worked more than 40 hours in one week. (Pls.' Decls., Dkt. 58-20, at ECF 38 ¶¶ 27–28.)  Her timesheets and wage statements largely confirm this.  Beginning on January 23, 2016, Williams typically worked 40 hours each week at an hourly rate of $17.54/ hour, and 8 additional hours at an hourly rate of $26.31. (Dkt. 58-17, at ECF 2–19, 23–26, 29–36, 39–42, 47–

48, 51–52, 56–63, 66–67, 70–77.) Williams also often worked 40 hours in one week at an hourly

rate of $16.29 and 20 additional hours at an hourly rate of $24.44. (*Id.* at ECF 10–13, 23–24, 33–

34, 37–38, 43–50, 56–61, 68–69, 72–73, 78–79.) On other weeks, her hours varied: Williams

worked for 84 hours in one week, with the first 40 hours at an hourly rate of $15.06, and the next

44 hours at an hourly rate of $22.59 (*id.* at ECF 20–22); in another week, Williams worked at an

hourly rate of $16.63 for the first 40 hours, and then 16 hours at an hourly rate of $24.95 (*id.* at

ECF 25–26); in yet other weeks, she worked for 40 hours at an hourly rate of $15.55, and then for

32 hours at an hourly rate of $23.33 (*id.* at ECF 37–40, 43–46, 53–55). Williams briefly earned a

higher hourly rate, working 40 hours at $21.93 and 20 additional hours at $32.90/hour for two

weeks (*id.* at ECF 27–28), but she was otherwise paid a maximum hourly rate of $19.00 for weeks

in which she worked fewer than 40 hours (*id.* at ECF 20–22, 31–32, 35–36, 53–55, 62–71, 76–77).

The last pay period included in Williams's wage statements ended on October 27, 2017. (*Id.* at

ECF 78–79.)

## III.    Prior FLSA Action Against Defendants

In 2007, nurse Claudia Gayle commenced a FLSA collective action against Harry's Nurses

and Harry Dorvilier, alleging that they had failed to pay overtime wages in violation of the FLSA.

*See Gayle v. Harry's Nurses Registry, Inc.*, No. 07-CV-4672 (CPS) (MDG), 2009 WL 605790, at

*1 (E.D.N.Y. Mar. 9, 2009). The Honorable Charles P. Sifton concluded that, as a matter of law,

Gayle was an employee of Harry's Nurses within the meaning of the FLSA, *see id.* at *9; found

Defendant Dorvilier jointly and severally liable because he was "a corporate officer with

operational control of [Harry's Nurses]," *id.*; and granted Gayle's motion for notice of collective

action under Section 216(b) of the FLSA, *see id.* at *11 (citing 29 U.S.C. § 216(b)). Following

Judge Sifton's order, approximately 55 plaintiffs[9] opted in to the FLSA collective action. *See Gayle v. Harry's Nurses Registry, Inc.*, No. 07-CV-4672 (NGG) (MDG), 2010 WL 5477727, at *2, 5 (E.D.N.Y. Dec. 30, 2010) (granting Gayle's summary judgment motion as to damages, but denying summary judgment as to damages for the remaining plaintiffs). The Second Circuit affirmed the district court's finding that, like Gayle, the field nurses were employees of Harry's Nurses for purposes of overtime under the FLSA. *See Gayle v. Harry's Nurses Registry, Inc.*, 594 F. App'x 714 (2d Cir. 2014) (summary order), *cert. denied*, 135 S. Ct. 2059 (Mem) (2015). The district court denied Defendants' subsequent motion for sanctions against plaintiffs' counsel for alleged improper accounting and collection of more than was due in attorneys' fees. *See Gayle v. Harry's Nurses Registry*, No. 07-CV-4672 (NGG) (MDG), 2018 WL 4771885 (E.D.N.Y. Sept. 30, 2018), *aff'd*, __ F. App'x __, 2020 WL 402452 (2d Cir. 2020).[10]

## IV.     Procedural History

Plaintiffs filed the instant action on November 1, 2017. (*See* Complaint, Dkt. 1.) On November 22, 2017, Attorney Michael K. Chong filed a notice of appearance on behalf of Defendants Dorvilier and Harry's Nurses (Dkt. 7) and filed an Answer to the Complaint on December 28, 2017 (Dkt. 11). Mr. Chong appeared before the Honorable Peggy Kuo, Magistrate

---

[9] Plaintiffs in the instant action were not members of the FLSA collective action in *Gayle*. *See generally Gayle*, 594 F. App'x at 714; *see also Gayle v. Harry's Nurses Registry, Inc.*, No. 07-CV-4672 (NGG) (MDG), 2012 WL 4174401, at *5 (E.D.N.Y. Sept. 18, 2012) (granting plaintiffs' motion for summary judgment on damages and listing the damages award for each plaintiff).

[10] The Court notes that, in 2012, Dorvilier was convicted in Queens County Supreme Court on two counts of Grand Larceny in the Third Degree and eleven counts of Grand Larceny in the Fourth Degree, based on allegations that, between August 2006 and November 2007, he "wrongfully withheld funds" from nurses hired by Harry's Nurses. *See In re Dorvilier and Harry's Nursery Registry*, No. 16-CV-01765 (AMD) (LB), 2017 WL 2377935, at *1, *4 (E.D.N.Y. May 31, 2017). In 2016, Defendant Dorvilier filed a federal *habeas* petition, pursuant to 28 U.S.C. § 2254, challenging his state court convictions. *Id.* That petition was denied in May 2017. *Id.*

Judge, at an initial conference on January 25, 2018, at which he stated that Harry's HomeCare either did not exist or may be closed.[11] (*See* Jan. 25, 2018 Minute Entry.) The case was referred to mediation, and a mediator was selected on March 9, 2018. On March 28, 2018, Mr. Chong filed a motion to withdraw from representation "due to a breakdown in communication and understanding" between himself and Defendant Dorvilier (Affidavit of Michael K. Chong, Esq., Dkt. 16-1, ¶ 2), whereby Dorvilier did not "respond[] to multiple requests that he provide information and documents," and, to the extent he did respond, "provided only very limited information or non-responsive information" (*id.* ¶ 4). At a hearing before Judge Kuo, Mr. Chong was terminated from the case, and Defendants were directed to retain new counsel by June 5, 2018, since the Corporate Defendants could not proceed *pro se*. (*See* Apr. 6, 2018 Minute Entry.) Thereafter, Defendant Dorvilier continued to appear *pro se*, and the Corporate Defendants failed to appear, plead, or otherwise respond to the Complaint. The Clerk's Certificate of Default as to the Corporate Defendants was entered on May 14, 2019 (Dkt. 47), and Plaintiffs filed a motion for default judgment, which was fully briefed on May 15, 2019 (Dkt. 48). To date, the Corporate Defendants have failed to respond to Plaintiffs' motion for default judgment.

By Order dated May 16, 2019, the Court deferred ruling on Plaintiffs' default judgment motion until the case against Defendant Dorvilier was resolved. On May 21, 2019, Plaintiffs requested a pre-motion conference for their anticipated summary judgment motion (Dkt. 52), which the Court denied as unnecessary, instead granting Plaintiffs leave to file their motion (*see* May 29, 2019 Order). Plaintiffs' motion for summary judgment was fully briefed on September 25, 2019. (Dkts. 58, 59, 60.)

---

[11] Plaintiffs filed an Affidavit of Service confirming that the Summons was served on Harry's HomeCare. (Dkt. 13-1.)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**I.     Legal Standard**

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (noting that summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the non-moving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the non-moving party is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotation and emphasis omitted).

When assessing whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any

disputed facts in the light most favorable to the non-moving party. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48.

In considering a dispositive motion brought or defended by a *pro se* litigant, the Court must "liberally construe" the *pro se* party's pleadings in his favor and hold him to "less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9–10 (1980) (internal quotations and ellipsis omitted); *see also Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) ("[The Second Circuit] liberally construe[s] pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." (internal quotation and citations omitted)). Nonetheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (internal quotation and citation omitted).

## II.    Analysis

Plaintiffs move for summary judgment on their claims that, in the period from approximately February 2016 to November 16, 2017,[12] Defendants failed to pay Plaintiffs wages

---

[12] While Plaintiffs' motion for summary judgment references a time period "beginning in February 2016 and continuing through December 2017," (Pls.' Mot., Dkt. 58-1, at 1), Plaintiffs' counsel later specified, in Defendant Dorvilier's deposition, that the relevant timeframe is "from February 2016 until November 16, 2017" (Dorvilier Dep., Dkt. 58-5, at 20:6–7). Plaintiffs themselves assert that they are entitled to wages from February 2016 through similar dates in mid-November 2017. (Pls.' Decls., Dkt. 58-20, at ECF 15 ¶ 73 (McFarlane, November 15), ECF 34 ¶ 76 (Palmer, November 17), ECF 50 ¶ 67 (Williams, November 16).) The Court, therefore, deems the relevant timeframe to be February 2016 to mid-November 2017.

and overtime wages to which Plaintiffs were entitled under the FLSA and NYLL (Pls.' Mot., Dkt. 58-1, at 11–13); that Plaintiffs are entitled to liquidated damages under both the FLSA and NYLL (*id.* at 13–15); that Defendants violated the anti-retaliation sections of the FLSA and NYLL (*id.* at 15–18); and that Defendants failed to maintain adequate records under the NYLL (*id.* at 18–19). In reviewing Plaintiffs' summary judgment motion, and given the Corporate Defendants' default, the Court considers these claims only as to Defendant Dorvilier.

### A.    Liability Under the FLSA and NYLL

The FLSA generally provides that "[e]very employer shall pay to each of his employees" a minimum wage, 29 U.S.C. § 206(a), and also that, with certain exceptions not relevant here, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for [her] employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which [s]he is employed," *id.* § 207(a)(1). Both provisions are limited to employees who are "engaged in commerce or in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce." *Id.* §§ 206(a), 207(a)(1). An employee bears the burden of establishing that she is covered under the FLSA. *See Locke v. St. Augustine's Episcopal Church*, 690 F. Supp. 2d 77, 84 (E.D.N.Y. 2010). Generally,

> in order to prove [d]efendants are liable for unpaid wages and failure to pay overtime, [plaintiffs] must demonstrate that: (1) [they each] had an employer-employee relationship with [d]efendants; (2) [d]efendants failed to pay [their] minimum wage and overtime; and (3) [plaintiffs or defendants] [were] engaged in commerce or in the production of goods for commerce.

*Alladin v. Paramount Mgmt., LLC*, No. 12-CV-4309 (JMF), 2013 WL 4526002, at *3 (S.D.N.Y. Aug. 27, 2013) (citing *Zhong v. August August Corp.*, 498 F. Supp. 2d 625, 628 (S.D.N.Y. 2007)).

Under the NYLL, the analysis of a wage-and-hour claim is similar to that under the FLSA, "except that the NYLL does not require plaintiffs to show a nexus with interstate commerce or a minimum amount of annual sales." *Tackie v. Keff Enter., Inc.*, No. 14-CV-2074 (JPO), 2014 WL 4626229, at *2 n.2 (S.D.N.Y. Sept. 16, 2014).

### 1.     Employer-Employee Relationship

Plaintiffs argue that they are employees of Defendants within the meaning of the FLSA and NYLL. (Pls.' Mot., Dkt. 58-1, at 4–8.) Defendant Dorvilier maintains that, "because the Federal government [has] an exemption for nurses[,] . . . they are independent contractors. They are not employees." (Dorvilier Dep., Dkt. 58-5, at 21:10–13; *see also id.* at 25:21–25 ("Nurses are not employees. They are independent contractors.").) In response, Plaintiffs aver that Defendant Dorvilier is collaterally estopped from maintaining that Plaintiffs are not employees under the FLSA because this question was decided by the district court, and affirmed by the Second Circuit, in *Gayle v. Harry's Nurses Registry*. (Pls.' Mot., Dkt. 58-1, at 4.)

"The doctrine of collateral estoppel prevents a plaintiff from relitigating in a subsequent proceeding an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003) (citation omitted).

> To prevail on a motion for summary judgment premised on collateral estoppel, the movant must satisfy the following elements: (1) the issues presented in the instant action are identical to those involved in the prior action; (2) the issues were actually litigated and decided in the prior action; (3) the estopped party had a full and fair opportunity to litigate the issues in the prior action; and (4) resolution of the issues was necessary to the final judgment.

*Medinol Ltd. v. Guidant Corp.*, 341 F. Supp. 2d 301, 314 (S.D.N.Y. 2004) (citing *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995)). The party moving for the application of collateral estoppel bears the burden of showing that the identical issue was decided in the prior action, and the nonmoving party bears the burden of showing that it

13

did not have a full and fair opportunity to litigate the issue in the prior action. *See id.* "The Court must also 'satisfy itself that application of the doctrine is fair.'" *Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 264 (S.D.N.Y. 2013) (quoting *Bear, Stearns & Co. Inc. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005)).

Here, Plaintiffs seek "to employ collateral estoppel offensively," *Bear Stearns*, 409 F.3d at 91, and "[t]rial courts have broad discretion in deciding when to permit the offensive use of collateral estoppel," *Wills*, 981 F. Supp. 2d at 264. The Court finds the elements of collateral estoppel satisfied and finds no reason that its application would be unfair to Defendant Dorvilier. First, for the purposes of coverage under the FLSA, the nature of the employer-employee relationship at issue here is identical to that in *Gayle*. In *Gayle*, the district court applied the "economic-reality test," *see Gayle*, 2009 WL 605790, at *5–*9, under which an employer-employee relationship turns on:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058–59 (2d Cir. 1988). The Circuit affirmed the district court's finding in *Gayle* that Defendants Dorvilier and Harry's Nurses exercised significant control over the field nurses and separately noted that the nurses had "no opportunity for profit or loss whatsoever" and that the nurses were "not just an integral part but the sine qua non of Harry's business." *Gayle*, 594 F. App'x at 717–18. Specifically, the Circuit concluded that the plaintiff nurses in *Gayle* were employees under the FLSA because Harry's Nurses would

> prohibit a nurse from contracting independently with placements, although its nurses may be listed with other agencies; prohibit a nurse from subcontracting a shift to another nurse; prohibit a nurse from taking a partial shift, although a nurse may decline a whole shift; and prohibit a nurse who is unilaterally terminated from

collecting contract damages, expectation damages, or liquidated damages, permitting only unpaid wages as damages.

*Gayle*, 594 F. App'x at 717.

The facts regarding Plaintiffs' relationship with Harry's Nurses and Defendant Dorvilier are sufficiently identical to warrant the application of offensive collateral estoppel.[13] Plaintiffs in this action, who are LPNs and were listed on the registry operated by Harry's Nurses, are essentially the same as the plaintiffs in *Gayle*, who were all LPNs or registered nurses (RNs) on the registry. *Id.* at 718. Indeed, the only difference between *Gayle* and this case is that a new group of nurses who worked for Defendants are now suing them. And Defendant Dorvilier has not submitted any evidence to refute the undisputed facts in Plaintiff's 56.1 statement, or otherwise show that Harry's Nurses has not continued to retain the same policies for field nurses that were in place during the time period at issue in *Gayle*. *See Lumbermens Mut. Cas. Co.*, 2012 WL 4498827, at *2 n.2 (regarding as undisputed facts not specifically controverted in a party's 56.1 statement); *see also Isigi v. Dorvilier*, 795 F. App'x 31, 33–34 (2d Cir. 2019) (summary order) (finding that, in action against Dorvilier and Harry's Nurses, in which default issued,[14] "under the doctrine of collateral estoppel, the determination in *Gayle* that the nurses are entitled to an overtime premium establishes [plaintiff]'s entitlement to the same").

As to the remaining elements of collateral estoppel, the issue of whether field nurses hired by Harry's Nurses are employees within the meaning of the FLSA was fully litigated in *Gayle* in

---

[13] However, the Court notes that most of the underlying citations in Plaintiffs' 56.1 statement cite to the facts alleged in *Gayle* or other exhibits submitted in that case, either at the district or circuit level. Plaintiffs have not otherwise established that Harry's Nurses maintained the same policies in the relevant time period.

[14] While Defendant Dorvilier has not defaulted in this action, his failure to dispute Plaintiffs' facts, which establish that Plaintiffs are sufficiently identical to the plaintiffs in *Gayle* to apply collateral estoppel, allows the Court to make a similar determination.

both the district court and before the Second Circuit. Defendant Dorvilier plainly had a full and fair opportunity to litigate the matter, as indicated by years of motion practice and appeal of that case, including to the Supreme Court. Lastly, resolution of the *Gayle* plaintiffs' classification as employees was critical to Judge Sifton's finding that the FLSA applied to their wage-and-hour claims. Thus, Defendant Dorvilier is collaterally estopped from asserting that Plaintiffs are not employees within the meaning of the FLSA.

The Court also agrees that *Gayle* collaterally estops Defendant Dorvilier from maintaining that *he* is not an "employer" under the FLSA; that issue, too, was fully litigated and resolved against Dorvilier in *Gayle*. (*See* Pls.' Mot., Dkt. 58-1, at 8–9.) In *Gayle*, the district court concluded—and the Circuit affirmed—that, because Defendant Dorvilier was a corporate officer with operational control over Harry's Nurses, he was jointly and severally liable to the plaintiffs as an individual employer. *See Gayle*, 2009 WL 605790, at \*9; *Gayle*, 594 F. App'x at 719. Here, the record itself shows sufficiently identical facts. According to his deposition testimony, Defendant Dorvilier has continued to "oversee the operation" of Harry's Nurses (Dorvilier Dep., Dkt. 58-5, at 6:9–11) and is the "sole owner" of the business (*id.* at 18–20). Thus, Defendant Dorvilier can be held liable as Plaintiffs' employer under the FLSA.

While *Gayle* did not address coverage under the NYLL, "[t]here is general support for giving [the] FLSA and the [NYLL] consistent interpretations . . . [and] there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)." *Hart v. Rick's Cabaret Intern., Inc.*, 967 F. Supp. 2d 901, 924 (S.D.N.Y. 2013) (internal citations omitted). The NYLL standard for determining employer status is also the same, as "the standard for employer status is nearly identical to that of the FLSA." *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 422 (S.D.N.Y. 2017); *see also id.* ("To be sure, the New

York Court of Appeals has not yet resolved whether NYLL's standard for employer status is coextensive with the FLSA's, but there is no case law to the contrary." (quoting *Hart*, 967 F. Supp. 2d at 940)).

Accordingly, the Court extends its application of collateral estoppel to Plaintiffs' NYLL claims, finding that an employer-employee relationship existed between Plaintiffs and Defendant Dorvilier under both the FLSA and NYLL.

### 2.    Unpaid Wages and Overtime

In order to establish liability for unpaid wages under the FLSA, a plaintiff must demonstrate that she "performed work for which [she] was not properly compensated and that [her] employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011). An employee can satisfy this burden by producing wage and hour records from her employer. *See Furk v. Orange-Ulster BOCES*, No. 15-CV-6594 (NSR), 2019 WL 4739140, at *7 (S.D.N.Y. Sept. 27, 2019) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). This burden "is not high," and a plaintiff may meet it "through estimates based on [her] own recollection." *Id.* (quoting *Kuebel*, 643 F.3d at 362); *see also Aponte v. Modern Furniture Mfg. Co.*, No. 14-CV-4813 (ADS) (AKT), 2016 WL 5372799, at *12 (E.D.N.Y. Sept. 26, 2016) (noting that "a general estimate based on an employee's recollection gives rise to a just and reasonable inference of uncompensated work sufficient to shift the burden onto the employer"). The requirements to establish liability for unpaid wages and overtime compensation under the NYLL are the same as those under the FLSA. *See, e.g., Alladin*, 2013 WL 4526002, at *3 (citing *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 84 (E.D.N.Y. 2012)).

Plaintiffs first claim that they were not paid at all for work they performed between the end of October 2017 and mid-November 2017. (Pls.' Decls., Dkt. 58-20, at ECF 15 ¶ 73 (McFarlane,

96 hours), ECF 34 ¶¶ 74–76 (Palmer, 124 hours), ECF 50 ¶ 67 (Williams, 48 hours).) Defendant does not dispute this claim. While there is no underlying record evidence to corroborate their assertion, Plaintiffs may rely on their recollections. Moreover, Plaintiffs have otherwise, through their timesheets and wage statements documenting similar hours worked in prior weeks, "present[ed] 'sufficient evidence to show the amount and extent of that [unpaid] work as a matter of just and reasonable inference.'" *Furk*, 2019 WL 4739140, at *7 (quoting *Mt. Clemens Pottery Co.*, 328 U.S. at 687). Accordingly, Plaintiffs have established Defendant Dorvilier's liability for unpaid wages under the FLSA and NYLL for the period from October 28, 2017 to November 16, 2017, for which they do not have timesheets or wage statements.

Plaintiffs have also established Defendant's liability for overtime violations from February 2016 to mid-November 2017. "The regular rate of pay is the 'keystone' for calculating the rate at which overtime is paid under the FLSA." *Lynch v. City of New York*, 291 F. Supp. 3d 537, 547 (S.D.N.Y. 2018) (citing *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945)). Under the FLSA, the regular rate of pay is "the hourly rate actually paid the employee for the normal, non-overtime workweek for which [she] is employed." 29 C.F.R. § 778.108 (citing *Walling*, 325 U.S. at 424). The regulation further provides that, "[i]f the employee is employed solely on the basis of a single hourly rate, the hourly rate is the 'regular rate,'" with overtime wages "determined by multiplying one-half the hourly rate by the number of hours worked in excess of 40 in the week" and adding that amount to 40 hours worked multiplied by the regular rate. 29 C.F.R. § 778.110(a). The regulations to the NYLL similarly provide that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of [the FLSA] . . . ." N.Y. Comp. Codes R. & Regs. tit. 12, sec. 142-2.2.

Plaintiffs predicate their argument for overtime wages in large part on a March 2015 letter allegedly sent by the Human Resources Manager of Harry's Nurses, offering each Plaintiff[15] an hourly pay rate of $25.00 and two weeks of vacation. (*See* Dkt. 58-8, at ECF 2–3.) Plaintiffs state that they returned to work at Harry's Nurses in or around February 2016 because of this letter. (Pls.' Decls., Dkt. 58-20, at ECF 5 ¶ 24 (McFarlane), ECF 20 ¶ 24 (Palmer), ECF 38 ¶ 25 (Williams).) Defendant Dorvilier has denied representing to Plaintiffs that they would be hired at the rate of $25.00 an hour, suggesting that, if he offered to hire Plaintiffs at such an hourly rate, Harry's Nurses would lose money because the Medicaid reimbursement is set at a lower amount.[16] (*See* Dorvilier Dep., Dkt. 58-5, at 19:6–13 ("[I]f the Medicaid reimbursement is $23, I don't know how I can make such statements to hire someone [at a] higher [rate].").)

At his deposition, Defendant Dorvilier maintained that Plaintiffs were paid overtime (*id.* at 22:11–13), but added that any overtime rate would "[d]epend[] on exactly how much the budget is and the Medicaid. It is not like you're required [to pay a certain rate]" (*id.* at 23:12–18). Dorvilier also repeatedly evaded the question of whether employees must be paid time and a half for hours worked over 40 in one week. (*Id.* at 24:5–29:5.) Dorvilier asserted that, in order to be paid overtime wages, Plaintiffs would "have to go to the New York State Department of Labor [in order to] apply for overtime[,] and then the State will come to the [Harry's Nurses] office and they will enforce that law." (*Id.* at 22:24–23:7.)

---

[15] Only Plaintiffs McFarlane and Palmer have submitted copies of the letter. (Dkt. 58-8.)

[16] In *Gayle*, Defendant Dorvilier described that the Medicaid reimbursement rate for LPNs was fixed at $24.00 an hour, and that Harry's Nurses paid its LPNs the reimbursement rate less $5.00/hour—that is, $19.00/hour. *Gayle*, 2009 WL 605790, at *3. Plaintiffs have not provided any evidence indicating whether the Medicaid rate has changed since *Gayle*.

While there is a genuine factual dispute as to whether Plaintiffs were promised a regular rate of pay of $25.00/hour when they returned to Defendants in February 2016, there is no dispute that they were, in fact, regularly paid at the hourly rate of $19.00 starting in February 2016. The parties' Memoranda of Agreement, executed in either 2008 or 2012 when Plaintiffs started working for Defendants the first time, stated only that "Harry's Nurses Registry, Inc. will pay a per diem of pay to be agreed upon prior to the commencement of duty." (Dkt. 58-12, at ECF 4.) The March 2015 letter,[17] which presumably followed Plaintiffs' departure from Harry's Nurses in early 2015,[18] was sent 11 months prior to Plaintiffs' resuming employment with Defendants and is not itself an agreement between the parties. The Court therefore finds that, while the March 2015 letter sent to Plaintiffs McFarlane and Palmer is not enough to definitively establish that all three Plaintiffs should have been "properly compensated" at an hourly rate of $25.00 with an overtime rate of $37.50/hour, Plaintiffs' timesheets and wage statements, discussed in detail *supra*, indicate that Defendant Dorvilier did not set an ascertainable regular rate of pay,[19] and Plaintiffs thus were not properly compensated at one-and-a-half-times that amount for the hours Plaintiffs worked over 40 in one week.

---

[17] As previously noted, although all three Plaintiffs left Harry's Nurses in 2015, the record only contains the March 2015 letter sent to McFarlane and Palmer. (*See* Dkt. 58-8.)

[18] Plaintiffs have not indicated in which month of 2015 they left Harry's Nurses.

[19] The Court notes that there is no evidence that Defendants ever adopted the fluctuating workweek method of calculating overtime compensation, summarized at 29 C.F.R. § 778.114, which would have required that Plaintiffs each be paid a fixed weekly salary, with an hourly rate determined by dividing their fixed salary by the number of hours they worked in that week. *See Cuzco v. Orion Builders, Inc.*, 262 F.R.D. 325, 330 n.14 (S.D.N.Y. 2009). As Plaintiffs occasionally worked fewer than 40 hours in a week, and were generally paid an hourly rate of $19.00 when they did so, they were evidently not paid a fixed weekly salary.

"In the absence of any written instrument memorializing the parties' intentions [as to rate of pay], the Court must infer the terms of their agreement from the entire course of their conduct, based on the testimonial and documentary evidence in the record." *Caltenco v. G.H. Food Inc.*, No. 16-CV-1705 (VMS), 2019 WL 4784065, at *10 (E.D.N.Y. Sept. 30, 2019) (quoting *Moon v. Kwon*, 248 F. Supp. 2d 201, 206 (S.D.N.Y. 2002)). Here, the undisputed evidence indicates, at a minimum, that Plaintiffs were regularly paid at the base rate of $19.00/hour after returning to Harry's Nurses in February 2016. With only a few aberrations, Plaintiffs were generally paid an hourly rate of $19.00 when they worked 40 or fewer hours in one week. However, when Plaintiffs worked more than 40 hours in one week, this hourly rate was adjusted *downwards* in proportion to the number of overtime hours worked. In practice, this meant that Plaintiffs were never paid more than approximately $19.00 per hour, regardless of how many hours they worked overtime. "A regular rate will not be recognized when it is set in a 'wholly unrealistic and artificial manner as to negate the statutory purpose' of the FLSA." *Switzoor v. SCI Eng'g, P.C.*, No. 11-CV-9332 (RA), 2013 WL 4838826, at *4 (S.D.N.Y. Sept. 11, 2013) (quoting *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 42 (1944)); *see also id.* ("[E]ven when wages exceed the minimum prescribed by Congress, the parties to the contract must respect the statutory policy of requiring the employer to pay one and one-half times the regular rate for all hours worked in excess of 40." (quoting *Helmerich & Payne, Inc.*, 323 U.S. at 42)).

In light of the above, the Court grants summary judgment to Plaintiffs as to Defendant Dorvilier's liability under the FLSA and NYLL for failure to pay wages and overtime wages.

### 3. Interstate Commerce Nexus

A plaintiff may satisfy the requirement of engagement in commerce by showing "individual coverage" through her personal engagement or "enterprise coverage" through her

employer's engagement in interstate commerce. *See Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 120 (E.D.N.Y. 2011). To be subject to enterprise coverage, an employer's "annual gross volume of sales made or business done [must] not [be] less than $500,000," and it must have "employees engaged in commerce or in the production of goods for commerce, or . . . employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person[.]" 29 U.S.C. § 203(s)(1)(A); *Seeman v. Gracie Gardens Owners Corp.*, 794 F. Supp. 2d 476, 483 n.2 (S.D.N.Y. 2011). "'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b).

Plaintiffs again maintain that Defendant Dorvilier is collaterally estopped from disputing this issue, given the finding in *Gayle*, and given that Harry's Nurses is "clearly engaged in commerce with an annual gross volume of business of no less than $500,000.00." (Pls.' Mot., Dkt. 58-1, at 10.) Defendant has done nothing to contest this allegation. The Court agrees that Plaintiffs have established enterprise coverage under the FLSA, though the Court does not rely on the district court's decision in *Gayle*, which does not address the commerce requirement. *See* 2009 WL 605790. However, with respect to annual gross volume of sales, the Court considers the other factual findings in *Gayle*, in conjunction with Plaintiffs' undisputed allegations and evidence, including wage statements, which collectively establish, *inter alia*, that Harry's Nurses employed upwards of seven full-time staff members and that as many as 500 nurses could be placed on its registry. The evidence clearly demonstrates that Defendants' annual volume of business exceeded the $500,000 threshold during the relevant time period.[20]

---

[20] Even assuming Harry's Nurses employed only 25 field nurses at a time, with no additional employees, and assuming that these nurses were paid at Plaintiffs' apparent regular rate

In addition, Plaintiffs have separately stated that they "maintained [their] own basic supplies including a blood pressure meter and stethoscope and [that they] purchased [their] own uniforms and paid for travel expenses." (Pls.' Decls., 58-20, at ECF 4 ¶ 21, ECF 19 ¶ 21, ECF 37 ¶ 22.) These facts, alone, are adequate to establish that Defendants were engaged in interstate commerce. *See, e.g., Rodriguez*, 784 F. Supp. 2d at 121 (noting that "local business activities fall within the reach of the FLSA when an enterprise employs workers who handle goods or materials that have moved or been produced in interstate commerce" (quoting *Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 530 (S.D.N.Y. 1998)); *see also Locke*, 690 F. Supp. 2d at 88 ("Cleaning products purchased locally have been moved in or produced for commerce, and custodians are employees who handle these products[.]" (internal quotation and citation omitted)); *Shim v. Millennium Grp.*, No. 08-CV-4022 (FB) (WP), 2009 WL 211367, at *3 (E.D.N.Y. Jan. 28, 2009) ("[T]he test is met if employees at [defendant] merely handled supplies or equipment that originated out-of-state . . . it is simply inconceivable that none of the medical, custodial or office supplies used at [defendant] originated outside of New York." (footnote omitted)).

Thus, Plaintiffs have established, as a matter of law, that Harry's Nurses is subject to enterprise coverage, given its gross volume of sales and its employees' engagement in interstate commerce.

### 4. Defendant Dorvilier's Asserted Defenses

In an Affidavit dated August 29, 2019, *pro se* Defendant Dorvilier responded to Plaintiffs' summary judgment motion[21] by asserting, in full, that he "never violate[d] the fair labor standard

---

of $19.00 and worked only 35 hours/week for 35 weeks during a year, Harry's Nurses would still exceed $500,000 in its annual gross volume of business.

[21] The Court ignores the portions of Defendant Dorvilier's Affidavit that seem to copy verbatim the language of Plaintiffs' claims—and which would thus be admissions of liability by

act provision and minimum wage and overtime provision set forth in Section § 206 and § 207." (Affidavit in Support of Defendant's Motion ("Def.'s Aff."), Dkt. 57, at ECF 4.) Dorvilier also submitted a number of exhibits. First, he provided a copy of a case[22] in which the Department of Labor sued a number of companies for FLSA violations (*see* Dkt. 57-1); based on that case, Dorvilier asserts that this Court lacks jurisdiction over the instant action because "[f]ederal claims pursuant to fair labor standers [sic] Act, 29 U.S.C. [ ] 201 et 219 can be enforceable only by US department of labor employment wager and hours division." (Def.'s Aff., Dkt. 57, at ECF 2 ¶ 4.) This is plainly incorrect. Second, Dorvilier seems to argue that, because Harry's Nurses was never "audited by [the] Department of Labor," he could not have violated the FLSA. (*Id.* at ECF 4.) This, too, is plainly incorrect.

Defendant Dorvilier has also submitted documents relating to a New York State Department of Labor investigation of Harry's Nurses (*see* Dkt. 57-5), which "never [found] [Defendant] in violation [of] federal and state minimum wage and overtime payments and liquated damage" (Def.'s Aff., Dkt. 57, at ECF 5). However, the Second Circuit considered this argument in *Gayle*, finding the State Department of Labor investigator's decision not to pursue a nurse's complaint against Defendants was not a "full adjudication on the merits" as required for collateral estoppel to bar plaintiffs from asserting liability under the FLSA. *Gayle*, 594 F. App'x at 719. This Court agrees.

---

Defendant—rather than Defendant's responses to Plaintiffs' claims. (*See, e.g.*, Def.'s Aff., Dkt. 57, at ECF 2 ¶ 9 ("Defendant['s] violations [of] 28 U.S[.C.] § 207 were deliberate and willful.").)

[22] The case on which Defendant Dorvilier relies is *Brock v. Superior Care, Inc.*, No. 83-CV-5569 (LDW), (E.D.N.Y. Jan. 30, 1987), in which nurses were held to be employees under the FLSA within the meaning of the "economic reality" test. (*See* Dkt. 57-1, at ECF 1–2, 9 ¶ 5.)

Next, Defendant has inexplicably submitted documentation of a 2014–15 New York State Department of Labor investigation,[23] which, unhelpfully for Defendant, found that "the nurses [Defendant] employ[s] are not independent contractors" (Dkt. 57-5, at ECF 10), and that Defendant owed unpaid overtime wages, unpaid wages, and unpaid wages for illegal deductions (*id.* at ECF 10–11). Defendant's remaining exhibits also only serve to reinforce Plaintiffs' claims in the instant action.[24] Finding meritless Defendant Dorvilier's defenses, which are relevant only to Plaintiffs' claims discussed thus far, the Court proceeds to Plaintiffs' remaining claims.

### B. Damages Under the FLSA and NYLL

Plaintiffs' requested damages for unpaid and overtime wages have been calculated based on the assumption that Plaintiffs were owed a regular rate of pay of $25.00 and an overtime rate of $37.50, according to the March 2015 letters sent to Plaintiffs McFarlane and Palmer. (*See generally* Pls.' Decls., Dkt. 58-20.) Because, as discussed *supra*, there is genuine dispute as to whether Plaintiffs were entitled to be paid at this rate, as opposed to a regular hourly rate of $19.00 and an overtime rate of $28.50, the Court denies summary judgment as to Plaintiffs' damages claim for unpaid wages and overtime under the FLSA and NYLL.

### C. Liquidated Damages

Plaintiffs argue that they are entitled to liquidated damages under both the FLSA and NYLL. (Pls.' Mot., Dkt. 58-1, at 13–14.) The FLSA provides that

---

[23] This investigation notes the earlier FLSA collective action against Defendants, *Gayle*, as well as "a criminal proceeding brought by the Queens District Attorney[]" against Dorvilier. (Dkt. 57-5, at ECF 10; *see supra* note 10.)

[24] For example, Defendant attaches an article that, in relevant part, merely summarizes the findings of the *Gayle* district court, concluding that Defendant was liable for failure to pay overtime wages under the FLSA as a matter of law. (*See* Dkt. 57-4, at ECF 3.)

> [a]ny employer who violates the provisions of . . . section 207 . . . shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b). However, district courts have the discretion "to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (quoting 29 U.S.C. § 260).

"To establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999); *see also Switzoor*, 2013 WL 4838826, at *5 ("'Good faith' in this context requires that a defendant produce 'plain and substantial evidence of at least an honest intention to ascertain what the [FLSA] requires and to comply with it.'" (quoting *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997))). The Second Circuit "has characterized the employer's burden as 'a difficult one,' emphasizing that 'double damages [are] the norm and single damages the exception.'" *Barfield*, 537 F.3d at 150 (quoting *Herman*, 172 F.3d at 142). The NYLL similarly allows an employee to recover liquidated damages "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law." N.Y. Lab. Law § 198(1-a).

Plaintiffs argue that Defendant could not have acted in good faith because he was "on notice that Plaintiffs were not independent contractors but rather employees under FLSA and NYLL based on the *Gayle* matter . . . ." (Pls.' Mot., Dkt. 58-1, at 14.) Defendant Dorvilier asserts that "he act[ed] in good faith to all the Plaintiff[s]." (Def.'s Aff., Dkt. 57, at ECF 4.) The Court agrees with Plaintiffs. Given Defendant Dorvilier's extensive and resoundingly unsuccessful

experience litigating the question of the registry nurses' coverage under the FLSA, his FLSA violations with respect to Plaintiffs could not have been made in good faith.[25] Rather than "tak[ing] active steps to ascertain the dictates of the FLSA and then act[ing] to comply with them," *Herman*, 172 F.3d at 142, Defendant Dorvilier knowingly and deliberately ignored the dictates of the FLSA and has instead resisted and sought to avoid paying wages that he knows are owed to Plaintiffs. "Such conduct, considered as a whole, demonstrates not a good faith effort to comply with the [FLSA and NYLL's] requirements, but instead a complete disregard for them." *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 340 (S.D.N.Y. 2005). Accordingly, the Court finds that Plaintiffs are entitled to liquidated damages as a matter of law.

"While the wording of the FLSA and the NYLL liquidated damages provisions are not identical, . . . there are no meaningful differences, and both are designed to deter wage-and-hour violations in a manner calculated to compensate the party harmed." *Rana v. Islam*, 887 F.3d 118, 122–23 (2d Cir. 2018) (internal quotation and citation omitted). As a result, the Second Circuit "interprets the NYLL and FLSA as not allowing duplicative liquidated damages for the same course of conduct." *Id.* Plaintiffs are nevertheless "entitled to recover under the statute that provides the great[er] relief." *Underwood v. TAFSC Hous. Dev. Fund Corp.*, No. 18-CV-6664

---

[25] Although the Court need only rely on the results of the *Gayle* litigation in reaching this conclusion—given that that case fully concluded before Defendants rehired Plaintiffs in February 2016, *see Gayle*, 594 F. App'x 714, *cert. denied*, 135 S. Ct. 2059 (Mem) (2015)—it is worth noting that, by February 2016: (1) Defendant Dorvilier had been convicted of grand larceny in state court for conduct involving the wrongful withholding of funds from nurses hired by Harry's Nurses, *see In re Dorvilier and Harry's Nursery Registry*, 2017 WL 2377935, at *1–4; (2) Defendants had been the subject of a 2014–2015 investigation by the New York State Department of Labor, in which the agency concluded that the nurses were not independent contractors (Dkt. 57-5, at ECF 10); and (3) Defendants had been sued in another FLSA/NYLL lawsuit, in which Defendants were found to have failed to pay their nurses overtime, *see generally Isigi v. Dorvilier*, 795 F. App'x at 34 (affirming district court ruling in FLSA/NYLL lawsuit, which was filed in 2016, that Dorvilier and Harry's Nurses were liable to nurses for overtime pay).

(JPO), 2019 WL 5485211, at *4 (S.D.N.Y. Oct. 25, 2019) (internal quotation, alterations, and citation omitted). The Court therefore denies Plaintiffs' request for liquidated damages under both statutes (*see* Pls.' Mot., Dkt. 58-1, at 14), but grants recovery of liquidated damages under the statute that provides Plaintiffs the greater relief.

### D.    Retaliation Under the FLSA and NYLL

Plaintiffs also move for summary judgment on their claim that Defendants retaliated against them, in violation of the FLSA and NYLL retaliation provisions, upon learning that Plaintiffs planned to file a lawsuit against Defendants. (Pls.' Mot., Dkt. 58-1, at 15–18.) The relevant portion of the FLSA makes it "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA]." 29 U.S.C. § 215(a)(3). Similarly, the NYLL in relevant part provides that an employer shall not "discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee . . . because such employee has made a complaint . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates [the NYLL]." N.Y. Lab. Law § 215(1)(a).

"At the summary judgment stage, courts address FLSA retaliation claims under the familiar 'burden-shifting' framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*," 411 U.S. 792 (1973). *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 471 (S.D.N.Y. 2008). At the first step, to allege retaliation under the FLSA, a plaintiff must "establish a prima facie case of retaliation by showing (1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010). As to the second element, in order to

show that an employment action disadvantaged her, an employee must show that the action "dissuaded a reasonable worker from making or supporting similar charges." *Id.* (internal quotation, alterations, and citation omitted). "Thus, the category of conduct that constitutes actionable retaliation includes more than just 'adverse employment actions' or 'ultimate employment decisions.'" *Torres*, 628 F. Supp. 2d at 472 (quoting *Wright v. Stern*, 450 F. Supp. 2d 335, 373 (S.D.N.Y. 2006)). With regard to the third and final element of a successful retaliation claim, "a plaintiff can indirectly establish a causal connection . . . by 'showing that the protected activity was closely followed in time by the adverse employment action.'" *Salazar v. Bowne Realty Assocs., L.L.C.*, 796 F. Supp. 2d 378, 384 (E.D.N.Y. 2011) (quoting *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001)).

Once the employee establishes a *prima facie* case of retaliation under the FLSA, "the burden shifts to the defendant to articulate a 'legitimate, non-discriminatory reason for the employment action.'" *Mullins*, 626 F.3d at 53 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). The burden-shifting standard for a retaliation claim under the NYLL is the same as that under the FLSA. *See, e.g.*, *Santi v. Hot in Here, Inc.*, No. 18-CV-03028 (ER), 2019 WL 290145, at *4 (S.D.N.Y. Jan. 22, 2019) (noting that FLSA and NYLL retaliation claims are governed by the same standard); *see also Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 302 (S.D.N.Y. 2011) (describing the burden-shifting standard of the NYLL retaliation section).

Here, Plaintiffs cannot establish a *prima facie* claim of retaliation. Although they have sufficiently established that they engaged in protected activity—both by filing the Complaint in this matter (Pls.' Mot., Dkt. 58-1, at 16), and by previously threatening to file a lawsuit regarding wages, which led to a settlement with Defendants in or around December 2016 (*id.* at 17)—they

cannot satisfy the second element, which requires a showing that Defendants took an employment action that would have "dissuaded a reasonable worker from making or supporting similar charges." *Mullins*, 626 F.3d at 53. The adverse employment action that Plaintiffs assert is Defendants' alleged failure to pay Plaintiffs at the rate of $25.00/hour with overtime at the rate of $37.50/hour. (Pls.' Mot., Dkt. 58-1, at 17.) This action is not only disputed by the parties (*see* discussion *supra*) but occurred *prior* to both the December 2016 settlement and the commencement of the instant action, on November 1, 2017. Based on Plaintiffs' own evidence, Defendants failed to pay them $25.00/hour beginning in February 2016, when Plaintiffs resumed working at Harry's Nurses. As such, Plaintiffs also cannot establish a causal connection between any protected activity and this purportedly adverse action.

Plaintiffs attempt to cure this defect in two ways. First, Plaintiffs assert that Defendants took "continued adverse actions that followed through December 2017." (*Id.*) However, as Plaintiffs do not otherwise elaborate upon the nature of these "continued adverse actions," the Court cannot credit this statement in Plaintiffs' summary judgment briefing.

Second, and seemingly in an effort to assert that they engaged in protected activity prior to January 2016, Plaintiffs argue that "[o]nly two months passed between the Defendants['] and Plaintiffs['] December 2015 settlement and Plaintiffs['] return to work in February 2016." (*Id.* at 18.) However, the record contains no evidence that the settlement occurred in December 2015; rather, what evidence there is in the record suggests that the settlement happened a year later, in December 2016. This evidence includes Plaintiffs' own 56.1 statement, which indicates that Plaintiffs "previously raised issues of unpaid wages in December 2016" (Pls.' 56.1, Dkt. 58-3, ¶¶ 66, 78, 90), and Plaintiffs' Declarations, which state that "[i]n 2016, [Plaintiffs] "entered into a stipulation of settlement with Defendants herein based upon an unpaid wage complaint" (Pls.'

Decls., Dkt. 58-20, at ECF 16 ¶ 78, ECF 34 ¶ 81, ECF 51 ¶ 72). At best, there remains a factual dispute as to whether the alleged adverse employment action took place before or after the parties' settlement of the first wage dispute, and no evidence indicating that it took place after Plaintiffs initiated this lawsuit on November 1, 2017.

Accordingly, the Court denies summary judgment as to Plaintiffs' retaliation claim under both the FLSA and NYLL.

### E.     Adequate Records Under the NYLL

Plaintiffs maintain that Defendants "failed to provide employees with paystubs that accurately reflected their rate of pay . . . and the amount of deductions taken from Plaintiffs' wages[,]" in violation of the NYLL.[26] (Pls.' Mot., Dkt. 58-1, at 19.)

Under the NYLL, the wage statement furnished to an employee must include

> the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages.

N.Y. Lab. Law § 195(3); *see also Rojas v. Splendor Landscape Designs Ltd.*, 268 F. Supp. 3d 405, 412 (E.D.N.Y. 2017) (summarizing N.Y. Lab. Law § 195(3)). For non-exempt employees, the wage statements "shall include the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked." N.Y. Lab.

---

[26] Plaintiffs also assert that the paystubs are deficient because they failed to include "Defendants' address and Defendants' other business, Harry's HomeCare." (Pls.' Mot., Dkt. 58-1, at 19.) However, the Court rejects this argument because the address for Harry's Nurses is clearly displayed on Plaintiffs' wage statements (*see generally* Dkts. 58-15, 58-16, 58-17), and Plaintiffs acknowledge that Harry's Nurses "does business as" Harry's HomeCare (Pls.' 56.1, Dkt. 58-3, ¶ 3). Although the NYLL requires an employer to furnish, at the time of an employee's hiring, a notice containing, *inter alia*, "any 'doing business as' names used by the employer," N.Y. Lab. Law § 195(1)(a), that requirement does not apply to employee wage statements, *see id.* § 195(3).

Law § 195(3). As of February 27, 2015, an aggrieved employee can recover $250 per work day that the violations occurred or continue to occur, with a maximum award of $5,000 with costs and reasonable attorney's fees. *Id.* § 198(1-d); *see also Ayala v. Looks Great Servs., Inc.*, No. 14-CV-6035 (ADS) (SIL), 2016 WL 3541548, at *3 (E.D.N.Y. June 23, 2016) (discussing increase in statutory damages amounts).

Upon examining Plaintiffs' wage statements, the Court does not find that they violate NYLL § 195(3). Aside from the fact that the wage statements issued by Defendants may indicate pay rates and wages that are disputed by the parties, the statements otherwise include, as required by NYLL §195(3), Plaintiffs' hourly rates, which are differentiated by hours worked up until 40 in one week and then hours past 40 in one week; the total number of hours worked at each rate; gross wages; various taxes and deductions; and net pay. The Court accordingly denies Plaintiffs' motion for summary judgment on their adequate records claim under the NYLL.

* * *

In sum, for the reasons discussed *supra*, the Court grants Plaintiffs' summary judgment motion as to Defendant Dorvilier's liability for failure to pay wages and overtime wages under the FLSA and NYLL. Because the parties dispute Plaintiffs' regular rate of pay, the Court denies Plaintiffs' summary judgment motion as to damages for these wage claims. The Court grants as to liability, but denies as to damages, Plaintiffs' motion for summary judgment as to liquidated damages. The Court denies Plaintiffs' summary judgment motion as to their retaliation claims under the FLSA and NYLL, and their adequate records claim under the NYLL.

## PLAINTIFFS' MOTION FOR DEFAULT JUDGEMENT

Plaintiffs have separately moved for default judgment as to the Corporate Defendants, Harry's Nurses and Harry's HomeCare. (Dkt. 48.) For the following reasons, this motion is granted as to liability, but denied as to damages.

## I.     Legal Standard

The procedure for entry of a default judgment is governed by Federal Rule of Civil Procedure 55(a), which provides that, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). "Because a corporation cannot proceed *pro se*, a corporate defendant's failure to obtain counsel is a failure to 'otherwise defend' under Rule 55(a)." *Gunderson v. Amazing Fireworks, LLC v. Merrick Bank*, No. 12-CV-3869 (JS) (AKT), 2016 WL 8711445, at *7 (E.D.N.Y. Feb. 19, 2016) (internal quotation, alterations, and citations omitted). Courts in this Circuit have outlined a two-step process: "first, the entry of a default, and second, the entry of a default judgment." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011) (citing *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)). The entry of default "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *Id.*; *see also Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) (noting that default judgments "track[] the ancient common law axiom that a default is an admission of all well-pleaded allegations against the defaulting party"). Second, the entry of a default judgment "converts the defendant's admission of liability into a final judgment that terminates the litigation

and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by Rule 54(c)."[27]  *Mickalis Pawn Shop*, 645 F.3d at 128.

"[T]he decision to grant a motion for a default judgment lies in the sound discretion of the trial court."  *O'Callaghan v. Sifre*, 242 F.R.D. 69, 73 (S.D.N.Y. 2007) (citing *Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 615 (2d Cir. 1999)).  A district court deciding a motion for default judgment "is required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor."  *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).  However, the court "need not agree that the alleged facts constitute a valid cause of action," *Mickalis Pawn Shop*, 645 F.3d at 137 (internal quotation and citation omitted), and must "determine whether [a plaintiff's] allegations establish [a defendant's] liability as a matter of law," *Finkel*, 577 F.3d at 84.

## II.     Analysis

### A.     Conduct Sufficient to Warrant Default Judgment

In resolving a motion for default judgment, "[a] threshold question before reaching liability or damages is whether [defendants'] conduct is sufficient to warrant default judgment being entered."  *Payamps v. M & M Convenience Deli & Grocery Corp.*, No. 16-CV-4895 (LDH) (SJB), 2018 WL 3742696, at *3 (E.D.N.Y. May 18, 2018).  In making this determination, a court is "guided by the same factors that apply to a motion to set aside entry of a default."  *Id.* (citing *Pecarsky v. Galaxiworld.com, Ltd.*, 249 F.3d 167, 170–71 (2d Cir. 2001); *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993)).  Courts in this Circuit generally consider three factors

---

[27] Federal Rule of Civil Procedure 54(c) provides that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.  Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."  Fed. R. Civ. P. 54(c).

in determining whether default judgment is warranted under Rule 55: "(1) whether the default was willful; (2) whether ignoring the default would prejudice the adversary; and (3) whether a meritorious defense is presented." *Mahoney v. Amekk Corp.*, No. 14-CV-4131 (ENV) (VMS), 2016 WL 6585810, at \*5 (E.D.N.Y. Sept. 30, 2016) (quoting *Enron Oil*, 10 F.3d at 95–96), *report and recommendation adopted*, 2016 WL 6601445 (E.D.N.Y. Nov. 7, 2016). "Other relevant equitable factors may also be considered, for instance, whether the failure to follow a rule of procedure was a mistake made in good faith and whether the entry of default would bring about a harsh or unfair result." *Addison v. Reitman Blacktop, Inc.*, 272 F.R.D. 72, 77 (E.D.N.Y. 2010) (quoting *Enron Oil*, 10 F.3d at 96).

### 1. Willfulness

"When a defendant is continually and 'entirely unresponsive,' a defendant's failure to respond is considered willful." *Northwell Health, Inc. v. Northwell Staffing Agency, LLC*, No. 17-CV-1611 (DRH) (AKT), 2018 WL 1525803, at \*4 (E.D.N.Y. Mar. 1, 2018) (internal citations omitted), *report and recommendation adopted*, 2018 WL 1525698 (E.D.N.Y. Mar. 28, 2018); *see also Elgard Corp. v. Brennan Const. Co.*, 248 F. App'x 220, 223 (2d Cir. 2007) (summary order) ("We have interpreted 'willfulness,' in the context of a default, to refer to conduct that is more than merely negligent or careless." (citing, *inter alia*, *S.E.C. v. McNulty*, 137 F.3d 732, 739 (2d Cir. 1998))). In addition, ignoring a court order to "seek substitute counsel by a given date" can show a "willful and deliberate disregard for [a court's] orders, which militates in favor of a default judgment." *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 123–24 (E.D.N.Y. 2011) (collecting cases).

The Court determines that the Corporate Defendants' failure to respond was willful, as evidenced by the behavior of Defendant Dorvilier, their owner. At the August 8, 2018 status

conference before Judge Kuo, Dorvilier was warned that, as a non-lawyer, he could not represent a corporate defendant in federal court. (Aug. 8, 2018 Minute Entry.) Plaintiffs, referencing their earlier letter dated August 6, 2018 (Dkt. 23), stated that they planned to move for default judgment against the Corporate Defendants (Aug. 8, 2018 Minute Entry). Defendant Dorvilier appeared before Judge Kuo again on November 2, 2018, where he was once more advised that, as a non-lawyer, he could not represent a corporate defendant in federal court and that, by continually failing to appear through counsel, Harry's Nurses and Harry's HomeCare could be considered to be in default. (Nov. 2, 2018 Minute Entry.) Defendant Dorvilier appeared before Judge Kuo yet again on January 18, 2019, at which time Defendants Harry's Nurses and Harry's HomeCare again failed to appear. (Jan. 18, 2019 Minute Entry.)

Defendant Dorvilier has demonstrated repeated and willful disregard for this litigation. The Corporate Defendants were initially able to retain counsel—attorney Michael K. Chong filed a notice of appearance on behalf of Defendants Dorvilier and Harry's Nurses (Dkt. 7), as well as an Answer to Plaintiffs' Complaint on December 28, 2017 (Dkt. 11). However, on March 28, 2018, Mr. Chong filed a motion to withdraw as Defendants' counsel "due to a breakdown in communication and understanding" between him and Defendant Dorvilier (Affidavit of Michael K. Chong, Esq., Dkt. 16-1, ¶ 2), whereby Dorvilier did not "respond[] to multiple requests that he provide information and documents," and, to the extent he did respond, "provided only very limited information or non-responsive information" (*id.* ¶ 4). On October 15, 2018, Plaintiffs filed a motion for sanctions due to Dorvilier's refusal "to proceed with his deposition." (Dkt. 27, at 1.) Furthermore, although proceeding *pro se*, Dorvilier is no stranger to litigation. (*See* discussion *supra.*) In light of these circumstances, the Court finds that Defendant Dorvilier demonstrated

willfulness through his clearly willful disregard for Judge Kuo's repeated cautions and instructions that the Corporate Defendants had to be represented by counsel.

### 2. Prejudice

To establish the "requisite level of prejudice, the plaintiff must demonstrate that any prejudice resulting from the defendant's default cannot be rectified in the Court in another manner were the default to be vacated." *Murray Eng'g, P.C. v. Windermere Prop. LLC*, No. 12-CV-52 (JPO), 2013 WL 1809637, at *5 (S.D.N.Y. Apr. 30, 2013) (citation omitted). A defaulting defendant's "delay . . . alone does not establish prejudice," *Enron Oil*, 10 F.3d at 98 (citation omitted), and the court "must consider the effect of the delay caused by the defendant's default . . . resulting in the loss of evidence, creating increased difficulties of discovery, or providing greater opportunity for fraud and collusion," *Swarna v. Al-Awadi*, 622 F.3d 123, 142 (2d Cir. 2010) (internal quotation, citations, and alterations omitted).

Plaintiffs argue that they are unduly prejudiced by the Corporate Defendants' default because, since Mr. Chong withdrew from representation in March 2018, "Plaintiffs [have been] limited to discovery with the individual Defendant only," thereby "allow[ing] Defendants further opportunity for potential fraud or collusion as well as the loss of evidence." (Plaintiffs' Motion for Default Judgment ("Pls.' Mot. D. J."), Dkt. 48-1, at 10.) While Plaintiffs have not demonstrated instances of Defendants' fraudulent or collusive conduct, or the loss of evidence, the Court credits Plaintiffs' assertion that they have been prejudiced by limitations in discovery, particularly in light of the difficulties they have had hitherto with Defendant Dorvilier. *See, e.g.*, *DIRECTV, LLC v. Wright*, No. 15-CV-474 (FPG), 2019 WL 6841555, at *5 (W.D.N.Y. Dec. 16, 2019) (granting plaintiff's motion for default judgment as to one defendant, in part because "defendant's refusal to

participate in discovery has hampered [plaintiff's] ability to collect evidence and determine its actual damages").

### 3. Meritorious Defense

Plaintiffs argue that the Corporate Defendants have failed to assert any defense other than the conclusory denials proffered in their Answer (Dkt. 11). (Pls.' Mot. D. J., Dkt. 48-1, at 9.) "A defense is meritorious if it is good at law so as to give the factfinder some determination to make." *Am. Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996) (internal quotations and citation omitted). Here, the Answer denies the allegations in the Complaint and asserts 28 affirmative defenses, though many of them are boilerplate and inapposite to this case. (*See* Answer, Dkt. 11, at 12–16.) "While the Answer contains only general defenses and does not present any underlying facts, that response is sufficient to raise a meritorious defense." *Rodriguez*, 784 F. Supp. 2d at 124 (collecting cases). The Court notes, however, that it has considered a number of these affirmative defenses in ruling on Plaintiffs' summary judgment motion, and the Court does not deem the defenses "good at law so as to give the factfinder some determination to make." *Am. Alliance Ins. Co.*, 92 F.3d at 61 (internal quotations and citation omitted).

### 4. Balancing the Factors

The Court has concluded that Defendants acted willfully and deliberately. While Plaintiffs have not supplied evidence for their allegation that vacating the Corporate Defendants' default will result in fraud, collusion, or a loss of evidence, the Court, as indicated, also credits Plaintiffs' assertion that they have been prejudiced by limitations in discovery due to the Corporate Defendants' default. The Court thus exercises its discretion to find that the aforementioned factors weigh towards granting Plaintiffs' motion for default judgment as to the Corporate Defendants. *See O'Callaghan*, 242 F.R.D. at 73 ("[T]he decision to grant a motion for a default judgment lies

in the sound discretion of the trial court." (citation omitted)). In addition, the Court neither finds that Defendants' disregard of procedure was done in "good faith," nor that granting default judgment would be a "harsh or unfair result," *Enron Oil*, 10 F.3d at 96, considering these particular parties. "[D]efault judgment is an appropriate sanction for 'defaults that arise from egregious or deliberate conduct.'" *DIRECTV, LLC*, 2019 WL 6841555, at *6 (quoting *1st Bridge LLC v. 682 Jam. Ave., LLC*, No. 08-CV-3401 (NGG) (MDG), 2009 WL 301941, at *1 (E.D.N.Y. Feb. 4, 2009)). The type of deliberate and obstructive conduct engaged in by the Corporate Defendants and Defendant Dorvilier, as their owner, is appropriately sanctioned by granting Plaintiffs' motion for default judgment as to the Corporate Defendants' liability.

### B. Liability and Damages

"[A] party's default is deemed as an admission of all [] well-pleaded allegations of liability." *Payamps*, 2018 WL 3742696, at *4 (citing, *inter alia*, *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)). Thus, "the Court must determine that Plaintiffs have adequately pled the requirements of liability under the FLSA and NYLL." *Rodriguez*, 784 F. Supp. 2d at 120. As Plaintiffs brought the same set of claims against all three Defendants, the Court has already reviewed Plaintiffs' pleadings in ruling on their summary judgment motion against Defendant Dorvilier and finds that Plaintiffs have sufficiently alleged violations of the FLSA and NYLL provisions relating to unpaid wages, overtime wages, and liquidated damages, but Plaintiffs have not pled facts sufficient to establish liability either for retaliation under the FLSA or NYLL, or the NYLL adequate records provision.

Accordingly, the Court finds that default judgment is warranted in this action. Based on its analysis relating to Plaintiffs' summary judgment motion, the Court finds that Plaintiffs have sufficiently alleged, and, indeed, have established as a matter of law, the Corporate Defendants'

liability for unpaid wages, overtime pay, and liquidated damages under the FLSA and NYLL. *See Mickalis Pawn Shop*, 645 F.3d at 128 (noting that the court must "determine whether [a plaintiff's] allegations establish [a defendant's] liability as a matter of law" (quoting *Finkel*, 577 F.3d at 84)). The Court does not find that Plaintiffs have established the Corporate Defendants' liability for retaliation under the FLSA or NYLL, or for failure to provide the information required on wage-related documents under the NYLL. Because, as discussed above, the Court cannot simply accept Plaintiffs' allegation that they were promised, or paid at, the regular rate of $25.00/hour, the Court cannot determine the amount of damages to award Plaintiffs as part of the default judgment against the Corporate Defendants. The Court will make that determination either following additional summary judgment briefing, if any, or as part of the trial on damages against Defendant Dorvilier.[28]

## CONCLUSION

For the reasons set forth above, the Court (1) grants Plaintiffs' summary judgment motion as to Defendant Dorvilier's liability under the FLSA and NYLL for failure to pay wages and overtime wages, but denies summary judgment on Plaintiffs' request for damages on those claims; (2) grants Plaintiffs' motion for summary judgment as to Defendant Dorvilier's liability for liquidated damages under the FLSA and NYLL, but denies summary judgment as to the amount of damages; (3) denies Plaintiffs' summary judgment motion as to retaliation under the FLSA and NYLL; (4) denies Plaintiffs' summary judgment motion as to adequate records under the NYLL; and (5) grants Plaintiffs' motion for default judgment against the Corporate Defendants, Harry's Nurses and Harry's HomeCare, as to liability for unpaid wages, overtime, and liquidated damages

---

[28] Because of the previously discussed factual dispute about what regular hourly rate Plaintiffs were entitled to beginning in February 2016, the Court cannot award damages against the Corporate Defendants without a damages inquest or, in this case, a trial on damages.

under the FLSA and NYLL, but denies default judgment as to their claims against the Corporate Defendants for retaliation under the FLSA and NYLL, and for failure to comply with the NYLL records requirements. The Court defers the award of damages as to the Corporate Defendants until after further summary judgment briefing or a damages trial as to Defendant Dorvilier.

In light of the above findings, the Court encourages Plaintiffs to consider pursuing, via a supplemental summary judgment motion, damages using a regular rate of pay of $19.00/hour and overtime rate of $28.50/hour, rather than proceeding to trial on damages. The Court grants Plaintiffs leave to renew their motion for summary judgment based on damages for their unpaid wages, overtime pay, and liquidated damages claims, as to which Defendants have been found liable as a matter of law, within thirty (30) days from the date of this Memorandum and Order. Should Plaintiffs opt not to do so, the parties shall file a joint pre-trial order—in anticipation of a damages trial—that complies with the Court's Individual Rules within sixty (60) days from the date of this Memorandum and Order.

SO ORDERED.

*/s/ Pamela K. Chen*

Pamela K. Chen
United States District Judge

Dated: April 2, 2020
      Brooklyn, New York